# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 13, 2019
NOT TO BE PUBLISHED

**FINAL**

# Supreme Court of Kentucky

2018-SC-000445-WC

MCCOY ELKHORN COAL CORP.                                   APPELLANT
INSOLVENT EMPLOYER, KENTUCKY COAL
EMPLOYERS SELF-INSURANCE FUND AND
ITS TPA HEALTHSMART


                    ON APPEAL FROM COURT OF APPEALS
V.                       CASE NO. 2017-CA-000137
            WORKERS' COMPENSATION BOARD NO. 13-WC-56897


GLADE TAYLOR, HONORABLE CHRIS                              APPELLEES
DAVIS, ADMINSTRATIVE LAW JUDGE AND
THE WORKERS' COMPENSATION BOARD


### MEMORANDUM OPINION OF THE COURT

### REVERSING AND REINSTATING


McCoy Elkhorn Coal Corporation appeals the Court of Appeals' reversal

and remand of the Administrative Law Judge's and Workers' Compensation

Board's order in favor of MECC on one of Glade Taylor's two claims for workers'

compensation benefits. Taylor allegedly suffered two work-related incidents

causing pain in his neck and cervical spine and his lower back. While the ALJ

awarded Taylor benefits for the injury relating to his lower back pain, the ALJ

dismissed Taylor's claim relating to the neck. In dismissing the cervical and

neck claim, the ALJ ruled that Taylor presented insufficient evidence to

support that claim, and a unanimous Board agreed. But the Court of Appeals

reversed the ALJ's dismissal of the neck claim. Finding that the Court of Appeals misapplied the appellate standard of review by failing to defer to the primary fact-finding role of the ALJ, we reverse the opinion pf the Court of Appeals and reinstate the opinion, award, and order of the ALJ.

## I. ANALYSIS.

Taylor challenges the ALJ's decision to dismiss his workers' compensation claim for neck and cervical pain stemming from an alleged incident at work, arguing that the ALJ's dismissal of his claim is contrary to substantial evidence favoring an award. But, "An injured worker bears the burden of proof and risk of non-persuasion before the ALJ with regard to every element of his claim."[1] "When there has been no award or the award is deemed insufficient, . . . the claimant, on appeal, must show that the evidence was so overwhelming as to compel a finding of the degree of disability to which he claims entitlement."[2] To expound on this standard of review, "where the party with the burden of proof is not successful before the ALJ, the issue on appeal is whether the decision was unreasonable because the overwhelming evidence favored that party."[3]

Because Taylor's claim failed before the ALJ, we must determine whether the evidence overwhelmingly favors his claim. As we make this determination, we are mindful of our statutes and caselaw that place the ALJ in the central

---

[1] *Kroger v. Ligon*, 338 S.W.3d 269, 272 (Ky. 2011) (citing *Roark v. Alva Coal Corp.*, 371 S.W.2d 856 (Ky. 1963); *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735 (Ky. App. 1984); *Snawder v. Stice*, 576 S.W.2d 276 (Ky. App. 1979)).

[2] *Stovall v. Collett*, 671 S.W.2d 256, 257 (Ky. App. 1984).

[3] *FEI Installation, Inc. v. Williams*, 214 S.W.3d 313, 316 (Ky. 2007) (citing *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986)).

role of fact-finder in workers' compensation cases. "The ALJ as fact finder has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence."[4] "KRS 342.285 gives the ALJ the sole discretion to determine the quality, character, and substance of evidence."[5] "As fact-finder, an ALJ may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same party's total proof."[6]

Taylor's appeal requires us to engage in a detailed examination of the facts in search of the overwhelming evidence that must exist to disturb the ALJ's factual findings.

### A. Factual Background.

MECC operated a sub-surface coal mine. Taylor began working at MECC in 2000, eventually working his way up to a position as mine foreman. And he worked in that position until December 10, 2013. Taylor alleges that two separate work-related injuries caused him to stop working.[7] Before his first alleged injury, he was working full time, was taking no medications for neck or back pain, and had no physical restrictions on his ability to perform his job.

---

[4] *LKLP CAC Inc. v. Fleming*, 520 S.W.3d 382, 386 (Ky. 2017) (citing *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985)).

[5] *Abel Verdon Const. v. Rivera*, 348 S.W.3d 749, 753–54 (Ky. 2011) (citing *Paramount Foods*, 695 S.W.2d at 418).

[6] *Rivera*, 348 S.W.3d at 753–54 (citing *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977)).

[7] Taylor testified that he previously had a back problem when he was lifting a crib at work but did not miss any work because of that injury. In 1994, Taylor filed a workers' compensation claim when he injured his left wrist. These are the only other injuries Taylor indicated he suffered before the two alleged incidents at issue in this case.

On March 5, 2013, Taylor allegedly struck his head on a beam and fell while carrying a heavy bucket of plaster in each hand, twisting his back and neck. He was accompanied at the time by a co-worker, who did not provide any testimony or statement in this case. Taylor allegedly experienced back, leg, and neck pain because of the incident. He completed his shift and reported his injury to the employer, testifying at the formal hearing that an accident report was filled out. But there is no such documentation in the record evidencing this incident, nor is there any evidence besides Taylor's testimony to prove that this incident indeed occurred.

Taylor's testimony wavered on his course of action after the March 5 incident. At first, Taylor testified that he missed no work after the March 5 incident, then he later testified that he did miss work because of that incident. Taylor was unsure of when he first sought medical treatment for his injury, but his medical records show that the first medical professional he saw after the accident was nurse-practitioner, Crystal Blair (also referred to as Crystal Branham).

Taylor saw Blair twice after the injury, on April 22 and on May 13, but never reported any neck or back pain during these appointments. In fact, Taylor explicitly denied having any lower back and neck pain during both of those appointments. Taylor saw Blair on August 29 when he complained of myalgia (muscle pain). Taylor spoke with Blair on September 5 and November 27, but he did not complain of any neck or back pain either time.

Taylor first sought treatment specifically for persistent lower-back and left-leg pain on November 1, 2013, with Dr. Maurice Trivette. Dr. Trivette x-rayed the lumbar spine and found mild degenerative disc disease. Taylor had a

4

follow-up appointment with Dr. Trivette on November 8. As the ALJ noted, Dr. Trivette's handwritten notes for both appointments are difficult to decipher. It appears that Dr. Trivette's notes indicate that Taylor appeared to have attributed his pain to trauma occurring "last March."

On December 10, 2013, Taylor suffered the second alleged injury at work. He was performing an inspection approximately three miles into the mine when the battery powering the carrier he was riding failed. The mine tunnel had a low ceiling, which necessitated that Taylor walk in a hunched position on his way back to the surface. While traversing a steep incline, Taylor fell, twisting as he fell, finally coming to a stop when he hit a wall. Taylor reported the injury to his supervisor and went home.

Two days later, Dr. Trivette ordered MRIs, and x-rays of both the lumbar and cervical spine, which were performed at Dr. Trivette's direction. The lumbar x-rays revealed mild degenerative disc disease, confirmed by the MRI. The MRI also revealed a herniation at the L5, S1 disc space and stenosis. On the MRI report is a note for a referral to a neurosurgeon. Although Dr. Trivette noted that Taylor came in with a "neck-related injury," Dr. Trivette's notes only appear to evidence that Taylor was complaining of lower back pain and left leg pain but not of neck pain. Dr. Trivette's notes also suggest that the December 12 appointment was a follow up to the November 1 appointment, not necessarily an appointment to evaluate potential injuries suffered by Taylor on December 10.

On December 19, 2013, Taylor again sought treatment from Blair, complaining that the medications prescribed to him by Dr. Trivette provided

5

only "minimal relief." He complained of back pain that radiated into his right thigh. Taylor, once again, did not complain to Blair of any neck pain.

On December 24, 2013, Taylor saw neurosurgeon Dr. Duane Densler, who noted Taylor's complaints of both back and neck pain. Dr. Densler prescribed pain medication.

Taylor saw Blair again on both February 6 and February 18, 2014, seeking treatment for other medical conditions. The reports from those visits indicate that Taylor was suffering from "back pain" and "disc herniation" at that time, but there is no indication Taylor was suffering from neck pain.

On February 27, 2014, Taylor returned to Dr. Densler, still complaining of back and neck pain. It appears Dr. Densler gave Taylor an epidural steroid injection to help with the pain.

Taylor filed a claim for workers' compensation benefits on July 10, 2014. He claimed two work-related injuries occurred causing him neck and cervical spine and back pain. During the pendency of Taylor's workers' compensation proceedings, he underwent five independent medical evaluations.

The first of these IMEs was conducted by Dr. David Muffly on June 27, 2014. Dr. Muffly reported cervical-disc degeneration and protrusion at the C4-C5 disc space, causing cervical strain. Dr. Muffly believed the lumbar-disc herniation and cervical strain to be related to the two injuries Taylor suffered while on the job, but, as the ALJ noted, Dr. Muffly did not discuss his reasons for that assessment. Dr. Muffly assigned Taylor a whole-person impairment rating ("WPI") of 11% for the two injuries—5% for his neck impairment and 6% for his lower-back impairment.

6

Dr. Zerga conducted the second IME on October 7, 2014. Dr. Zerga reported that Taylor told him the pain was most intense in the sacral-coccygeal area. Dr. Zerga also reported normal range-of-neck movement during conversation and that Taylor "does not have any evidence of significant cervical or lumbar spine disease." Dr. Zerga diagnosed Taylor with coccyx pain and assigned a 3% WPI rating. Dr. Zerga opined that the March 5 incident caused Taylor to traumatize his coccyx with resulting discomfort. Finally, Dr. Zerga stated, "It is a rather odd case because it doesn't fit exactly the DRE categorization, nor does it fit the range of motion categorization."

Dr. G. Chris Stephens conducted the third IME on October 31, 2014. Dr. Stephens noted that Taylor reported neck pain that radiated into his right shoulder and back pain that extended into his legs. Dr. Stephens reported Taylor's "chronic neck pain secondary to moderately severe cervical spondylosis." Significantly, Dr. Stephens also noted his complete disagreement with Dr. Zerga's assessment, going so far as to say that he was uncertain how Dr. Zerga reached his conclusions. Ultimately, Dr. Stephens concurred with Dr. Muffly's belief that Taylor's condition was work-related and assigned a 5% WPI to both the cervical and lumbar injuries. But Dr. Stephens's reasons for believing the injuries to be work-related appear tenuous:

> It is documented by Dr. Trivette that it was a work-related injury; though he never specifically mentions the March date. It is also quite atypical that no mention was ever made of any of these problems during the visits he had with nurse practitioner Blair. He was seen at this facility in April, May, and August. No mention was made of spinal complaints or of a spinal injury. Having said that, I am giving this gentleman the benefit of the doubt and trusting the history that I obtained from him to be accurate. I do not find evidence in this case that he injured his coccyx and I am uncertain as to how Dr. Zerga came to that conclusion given his current

7

subjective symptoms, physical findings, and findings on diagnostic studies.

Taylor saw Dr. David Weber on November 5, 2014. Dr. Weber attributed Taylor's complaints to a work-related injury, diagnosing Taylor with lumbar degenerative disc disease, sciatica due to displacement of a lumbar disc, and cervicalgia. While Dr. Weber did not assign an impairment rating, he noted that Taylor has difficulty walking, standing, or sitting for prolonged periods of time, cannot lift over ten pounds, and cannot do repeated bending or stooping. Dr. Weber also noted that he did not believe Taylor could return to the type of work he did at the time of his injury.

Taylor was evaluated by Dr. Ralph Crystal on November 18, 2014. Dr. Crystal conducted a vocational and occupational employability evaluation. Dr. Crystal administered a broad range of aptitude and vocational tests, finding Taylor to have the academic and intellectual abilities to perform a wide range of jobs. Dr. Crystal also opined that Taylor does not have a complete and permanent inability to perform any type of work because of his reported injuries. With or without training or education, Taylor is qualified to perform physically and not disabled from employment, Dr. Crystal found.

Taylor saw Dr. Densler on February 26, 2015, complaining of neck pain. Taylor noted that twelve sessions of physical therapy and two epidural steroid injections did not provide relief. Dr. Densler referred Taylor to another twelve sessions of physical therapy, primarily to prevent a "frozen" right shoulder. Neck surgery was also discussed. Taylor returned to Dr. Densler on March 24 with complaints of neck pain. Dr. Densler assessed Taylor with degeneration of cervical intervertebral discs at C4-5 and C5-6. Taylor elected to treat the pain

8

surgically. On July 24, 2015, Dr. Norman Mayer performed cervical-fusion surgery. Dr. Mayer diagnosed Taylor with cervical disc degeneration. The preoperative and postoperative diagnosis was herniated nucleus pulposus C4-5 and C5-6 with cervical radiculopathy. Taylor saw Dr. Mayer for a follow-up on August 20, 2015, still complaining of neck pain. Dr. Mayer noted bilateral posterior neck pain that Taylor described as aching, dull, and sharp. An x-ray of the cervical spine showed the fusion in anatomic alignment, but also showed large spurs forming anteriorly at C6-7. At a follow up appointment on October 20, Taylor noted that his pain level had improved.

On December 23, 2015, Dr. Timothy Kriss conducted the fourth IME. Dr. Kriss noted signs of symptom exaggeration. He concluded that Taylor's pain was not caused by a work-related injury but rather the arousal of a dormant, pre-existing condition that became symptomatic following the December 10 incident. Dr. Kriss assigned a WPI rating of 25% but noted that the rating was based entirely on the outcome of Taylor's surgery, which Dr. Kriss concluded was to repair damage in his cervical spine resulting not from work-related injuries but from the natural process of aging. Dr. Kriss assigned a 5% WPI rating for Taylor's lumbar injury. Finally, Dr. Kriss concluded that Taylor was functionally capable of returning to work and that there was no objective medical basis for imposing restrictions.

On February 4, 2016, Taylor returned to Dr. Muffly for the fifth and final IME. Dr. Muffly noted that Taylor's vertebral fusion was not yet solid and needed more time to improve. Dr. Muffly opined that Taylor's cervical symptoms, which were directly caused by his work-related injuries from March 5 and December 10 of 2013, progressively worsened to the point that surgical

9

correction became necessary. Again, Dr. Muffly did not explain exactly how those incidents resulted in Taylor's injuries and pain. In assessing Taylor's post-surgery condition, Dr. Muffly assigned Taylor a WPI rating of 31% and opined that he could not return to his previous employment even with stringent restrictions on lifting, bending, and working overhead.

Taylor testified that he suffers from back pain, pain in his legs, pain running down his legs and buttocks, and neck pain. He testified that he takes three different types of medication, after which he must lie down for an hour or two at a time. He can sit for about 20 to 30 minutes but then must get up and move around. He can probably stand for an hour or two at a time. Taylor estimates he could walk one city block before he would have to stop and rest or get into another position. Taylor also testified that his pain prevents him from fishing, from helping around the house, and from getting a good night's sleep.

Ultimately, the ALJ was persuaded by Dr. Kriss's findings and denied Taylor's claim relating to his cervical impairment. The ALJ first noted that he "ha[d] some problems with Mr. Taylor's testimony in the case." The ALJ believed Taylor has a "tendency to become anxious and focus on his symptoms with hints of exaggeration." The ALJ supported his belief by noting Blair's diagnoses confirming such.[8]

The ALJ also noted a discrepancy between Taylor's condition at his deposition and during his evaluation by Dr. Crystal. During Taylor's appointment with Dr. Crystal on November 18, 2014, Taylor reported limited

---

[8] According to Blair, Taylor suffers from multiple ailments, including: hypertension, malaise/fatigue, myalgia, benign prostatic hypertrophy, anxiety disorder, insomnia, back pain, snoring, shortness of breath, COPD, disc degeneration, herniated disc syndrome, neck disorder, and esophagitis.

driving ability with pain in his lower back, both legs, both shoulders, and both arms, requiring the use of a cane. Yet, as the ALJ noted, Taylor reported none of these problems during his deposition on September 17, 2014. Additionally, Taylor testified at the formal hearing that he had just gotten a cane on his own to steady himself. Finally, there was a discrepancy about Taylor's ability to mow his lawn—to Dr. Crystal, Taylor stated that he must take breaks and let his son mow the yard, while he stated at the formal hearing that he could mow his whole yard in about five minutes using his riding mower.

The ALJ questioned the truthfulness of Taylor's alleged March 5 injury. The ALJ noted that Taylor testified that he hit his head so hard on the overcast that he broke his hard hat. Yet, the ALJ noted the absence of evidence exists to support that assertion—no accident report was filed and the miner who was purportedly with him at the time did not provide a statement or testimony. The ALJ observed that "[a]ll of that could possibly be overlooked if there was any evidence that he suffered an actual injury contemporaneously with the claimed of injury." But, as the ALJ noted, there is not—Taylor "did not have any proof of injury."

As stated, the ALJ agreed with Dr. Kriss's evaluation of Taylor, finding Dr. Kriss's articulated chronology of the case persuasive:

1) No cervical or lumbar permanent work injury on March 5, 2013.
2) Eight subsequent months of no cervical or lumbar symptoms, no cervical or lumbar treatment, no cervical or lumbar diagnoses, no cervical or lumbar restrictions, and no spinal-induced time off from work.
3) Three intervening medical evaluations with no cervical or lumbar symptoms, diagnoses or treatment. (Crystal Blair, APRN – Hometown)
4) Three intervening medical evaluations at which Mr. Taylor explicitly denied any neck or low back pain. (Crystal Blair Branham, APRN – Hometown)

11

5) Spontaneous, atraumatic, degenerative age-appropriate back pain onset in November 2013. (Visit to Dr. Trivette)
6) December 10, 2013 work-related aggravation of pre-existing active non-work-related back pain.
7) There is no cervical spine injury or permanent harmful change on March 5, 2013 or December 10, 2013.

The ALJ agreed with Dr. Kriss's assertion that, medically speaking, if Taylor's December 10 alleged work injury truly caused a permanent impairment to his neck and cervical spine, Taylor should have been suffering from neck pain during his two visits days later with Dr. Trivette and Blair. Instead, Dr. Kriss was convinced that Taylor's pain was caused by something else, with which the ALJ agreed: "When neck pain and upper extremity complaints manifest later, spontaneously and atraumatically, this is most likely a consequence of the fairly advanced, objectively demonstrated osteoarthritis, degenerative disc disease and spondylosis radiographically confirmed to be chronically present in Mr. Taylor's cervical spine all along, - a totally age-appropriate, totally natural manifestation of unavoidable degeneration or 'aging.'"

The ALJ found Dr. Muffly's medical report to be tainted because Dr. Muffly "received an inaccurate history of the event. [Dr. Muffly] was not aware of all the circumstances . . . [and relied] solely on the patient history in his assessment."

In the end, the ALJ differentiated between two types of pain from which Taylor was suffering. Regarding Taylor's claim of neck and cervical spine pain, the ALJ found that Taylor did not meet his burden of proof that he sustained a work-related injury to those areas. But the ALJ did find that the December 10 incident contributed to Taylor's lower-back injury, resulting in a 6% WPI rating

12

that translated into an award of temporary total and permanent-partial disability benefits. Finally, the ALJ found Taylor to not be totally and permanently disabled from all work.

Taylor moved for reconsideration of the ALJ's decision, which a different ALJ reviewed and denied. Taylor then appealed to the Board, which unanimously affirmed. In so doing, the Board noted that the only issue Taylor raised on appeal is the ALJ's dismissal of the neck and cervical spine claim. Likewise, this is the only issue before us today.

Taylor appealed the Board's decision to the Court of Appeals, which reversed the ALJ on the dismissal of the cervical spine and neck claim. The Court of Appeals likened the reliance of the ALJ on Dr. Kriss's report to the ALJ's reliance on a faulty doctor's report in *Cepero v. Fabricated Metals Corp*, a case in which this Court reversed the ALJ's decision to award the claimant benefits based on the ALJ's reliance on that medical report.[9] MECC then appealed to this Court as a matter of right.[10]

## B. The Court of Appeals did not properly defer to the ALJ's fact-finding.

At the outset, we note that the Court of Appeals appears to have relied on the wrong standard of review in reversing the ALJ and Board. Nowhere in the majority opinion is the overwhelming-evidence standard recited;[11] instead, it

---

[9] 132 S.W.3d 839, 842–43 (Ky. 2004).

[10] *Vessels by Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795, 798 (Ky. 1990) ("[W]orkers' compensation claims that are first judicially reviewed in the Court of Appeals pursuant to KRS 342.290, and there ruled upon, may be appealed to the Kentucky Supreme Court as a matter of right pursuant to Section 115 of the Kentucky Constitution.").

[11] The concurring opinion cites to that standard.

appears the Court of Appeals relied on a substantial-evidence standard. To reiterate, "When there has been no award or the award is deemed insufficient, . . the claimant, on appeal, must show that the evidence was so overwhelming as to compel a finding of the degree of disability to which he claims entitlement."[12]

After Taylor lost before the ALJ, his strategy throughout this case has been an attempt to discredit the opinion of Dr. Kriss, that opinion having been heavily relied upon by the ALJ in deciding to dismiss Taylor's claim regarding his cervical pain. Specifically, Taylor attempts to discredit Dr. Kriss's opinion in the following ways: 1) Dr. Kriss allegedly incorrectly concluded that Taylor had neither complained of, nor sought treatment for, an injury to his cervical spine between March 5, 2013, and December 10, 2013; 2) Dr. Kriss failed to note that MECC stipulated that it had been timely notified of Taylor's alleged work-related injuries; 3) Dr. Kriss failed to mention that Taylor was receiving temporary-total disability benefits at the time Dr. Kriss evaluated him; 4) Dr. Kriss failed to mention Dr. Trivette's referral to a neurosurgeon; and 5) Dr. Kriss's failure to "explain away" the cervical MRI report by Dr. Trivette on December 12, 2013.

We fail to see how the alleged second and third alleged failures of Dr. Kriss have any relevance to Dr. Kriss's medical evaluation of Taylor. Stipulating to the occurrence of a work-related incident or the fact that the claimant is receiving temporary-total disability benefits in no way proves that that work-related incident caused the alleged neck pain from which Taylor now suffers.

---

[12] *Stovall*, 671 S.W.2d at 257.

Regarding Dr. Kriss's failure to note Dr. Trivette's neurosurgeon referral, in alleging that Dr. Kriss's report is faulty because of his failure to note that referral, Taylor is assuming that the simple referral to a neurosurgeon proves that his alleged work-related incident resulted in his neck and cervical pain. Yet there could be a multitude of reasons Dr. Trivette referred Taylor to a neurosurgeon, and Dr. Trivette did not state his reasons for this referral. Moreover, referral to a neurosurgeon does not evidence Taylor's assertion that the alleged incident at work caused his neck and cervical pain.

Regarding Dr. Kriss's first alleged faulty statement, even the Court of Appeals, which ruled in favor of Taylor, recognized that "no medical evidence of record mentions a neck injury until [Taylor] sought treatment for the second injury on December 10, 2013[.]"

Finally, regarding Dr. Kriss's alleged fifth failure to have not "explain[ed] away" Taylor's December 12 cervical MRI, Taylor does not provide any evidence explaining the link between the cervical MRI and the workplace incident. In fact, there is no indication from Dr. Trivette's largely illegible report that Taylor complained of neck pain to prompt such an MRI. Although the top of the report notes that Taylor was in for a "neck related injury," Dr. Trivette could have ordered a cervical MRI to assist in explaining the lower-back and left-leg pain for which Taylor had seen Dr. Trivette the month before, which is somewhat evidenced by the fact that Dr. Trivette appears to have termed the December 12 appointment as a "follow up." The fact that Taylor does not appear to have complained of neck pain to Dr. Trivette at that time appears to be corroborated by the fact that he did not complain of neck pain during his appointment with Blair a week later. And while Taylor did first report neck pain two weeks after

15

the workplace incident, we note that Taylor saw Blair twice after that December 24 appointment and did not complain of neck pain either time.

In contrast to Dr. Kriss's report, Taylor points to Dr. Muffly's report and Dr. Muffly's categorical statement that Taylor's cervical pain stems from work-related injuries. While "KRS 342.0011(1) does not require [causation] to be proved with objective medical findings," "[m]edical causation must be proved to a reasonable medical probability with expert medical testimony."[13] "It is the quality and substance of a physician's testimony, not the use of particular 'magic words,' that determines whether it rises to the level of reasonable medical probability, i.e., to the level necessary to prove a particular medical fact."[14] "Where there is conflicting medical testimony concerning the cause of a harmful change, it is for the ALJ to weigh the evidence and decide which opinion is the most credible and reliable."[15] Dr. Muffly did not articulate any reasoning for his conclusion whatsoever. Not only that, but Dr. Kriss explicitly refuted Dr. Muffly's conclusion, thereby presenting the ALJ with at least differing expert opinions, upon one of which it is within his province to rely: "Where . . . the medical evidence is conflicting, the question of which evidence to believe is the exclusive province of the ALJ."[16]

---

[13] *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615, 621 (Ky. 2004) (citing *Staples, Inc. v. Konvelski*, 56 S.W.3d 412, 415 (Ky. 2001); *Dupree v. Kentucky Dept. of Mines and Minerals*, 835 S.W.2d 887 (Ky. 1992)).

[14] *Upchurch*, 127 S.W.3d at 621 (citing *Turner v. Commonwealth*, 5 S.W.3d 119, 122–23 (Ky. 1999)).

[15] *Id.*

[16] *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993) (citing *Pruitt v. Bugg Brothers*, 547 S.W.2d 123 (Ky. 1977)).

And, whereas Taylor argues that Dr. Kriss's report should be discredited for having failed to consider Dr. Muffly's IME, Dr. Muffly, as the ALJ noted, failed to consider Taylor's treatment with Blair. It would be inconsistent for a reviewing court to accept Taylor's criticisms of Dr. Kriss's report yet ignore Dr. Muffly's failures—much of the alleged "failures" of the doctors are the same. Moreover, the only other causal explanation for Taylor's neck and cervical pain given by a doctor in this case, other than Dr. Kriss's, comes from Dr. Zerga. Yet Dr. Stephens completely disagreed with that finding. And "trust" appears to be the only reason Dr. Stephens attributed Taylor's pain to any work-related accident. Simply put, Taylor cannot point to overwhelming evidence to support his claim.

Finally, Taylor likens the circumstances of his case to this Court's decision in *Cepero*. But that case is distinguishable. In *Cepero*, the Court found that the ALJ improperly relied upon the IMEs of two doctors who were unaware of a major knee injury the claimant had suffered before the work-related knee injury.[17] Specifically, the claimant had torn his ACL three years before the alleged work-related knee injury for which he sought benefits.[18] The two doctors who knew about that earlier injury explained that a torn ACL cannot repair itself, thus attributing the claimant's claim to that injury instead of the knee injury he suffered at work.[19] The two doctors who did not know about this earlier injury "[u]nsurprisingly," as the Court put it, attributed the claimant's

---

[17] *Cepero*, 132 S.W.3d at 841.

[18] *Id.* at 840–41.

[19] *Id.*

17

claim to the work-related injury.[20] While the ALJ relied on the latter two doctors' reports, the Board unanimously reversed almost assuredly because the latter two doctors would not have concluded in the way they did had they known about the earlier knee injury.[21]

The ALJ found in favor of the claimant, so the Court examined the case using the substantial evidence, not overwhelming evidence, standard.[22] Moreover, whereas the two doctors' opinions relied upon by the ALJ in *Cepero* were unreliable because of the missing piece of the claimant's medical history that would have completely changed their conclusion,[23] the only medically relevant evidence Dr. Kriss is alleged to have failed to review is one of Dr. Muffly's IMEs. In fact, as stated by Dr. Kriss in his report, Dr. Kriss relied on "all of the records provided to me, including those of Dr. Zerga, Trivette, Ahmed, Crystal Blair APRN, Densler, Weber, Fogg, Stephens, and Coughtry" in addition to "radiology reports and films" and "medical records from physical therapy, the Kentucky Department of Workers Claims (Form 101), and Ralph Crystal[.]" Failing to consider one IME, an IME containing a conclusory finding as to causation, is distinguishable from failing to consider a critical event in a patient's medical history that all but decides the case the opposite way, like in *Cepero*.

---

[20] *Id.* at 841.

[21] *Id.* at 842–43.

[22] *Id.* at 842.

[23] *Id.* at 842–43.

18

Simply put, Taylor points to little evidence supporting his claim that a work-related incident occurred that resulted in the neck and cervical pain from which he currently allegedly suffers.

A review of the Court of Appeals' holding in favor of Taylor discloses that the panel improperly reweighed the evidence presented in the case, with statements like the following evidencing that fact: "In our reading of the IME report Dr. Kriss generated, it is plainly evident that he began with an assumption that Taylor may have been exaggerating his symptoms, and then that Taylor must have lied regarding both of his work accidents." As we stated earlier, "The ALJ as fact finder has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence."[24] "KRS 342.285 gives the ALJ the sole discretion to determine the quality, character, and substance of evidence."[25]

And although the concurring opinion notes that Taylor's medical records reveal Taylor to have been treated for cervical pain close in time to the December 10 workplace accident, the only evidence explicitly linking that pain to the workplace accident are the conclusions of three doctors—Drs. Muffly, Zerga, and Stephens. As mentioned, Dr. Muffly offered no explanation for his conclusory finding. Dr. Zerga opined trauma to the coccyx, and he was the only doctor to do so, a finding that was completely refuted by Drs. Stephens and Kriss. And Dr. Stephens made the same conclusory finding Dr. Muffly made

---

[24] *LKLP CAC Inc. v. Fleming*, 520 S.W.3d 382, 386 (Ky. 2017) (citing *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985)).

[25] *Abel Verdon Const. v. Rivera*, 348 S.W.3d 749, 753–54 (Ky. 2011) (citing *Paramount Foods*, 695 S.W.2d at 418).

19

solely because he was "giving [Taylor] the benefit of the doubt and trusting the history that [he] obtained from him to be accurate." Such evidence cannot amount to the overwhelming evidence required by law to reverse the decision of the ALJ as affirmed by the unanimous ruling of the Board.

We find no reason to disturb the findings of the ALJ and the Board.

## II. CONCLUSION.

Finding that the Court of Appeals did not appropriately defer to the findings of the ALJ, we reverse the Court of Appeals and reinstate the opinion and order of the ALJ.

Minton, C.J.; Buckingham, Hughes, Keller, VanMeter, and Wright, JJ., sitting. Minton, C.J.; Buckingham, Hughes, Keller, VanMeter, and Wright, JJ., concur. Lambert, J., not sitting.

COUNSEL FOR APPELLANT:

Terri Smith Walters
Jones & Walters, PLLC

COUNSEL FOR APPELLEE: GLADE TAYLOR

Randy G. Clark
Clark & Johnson

Honorable Chris Davis, Administrative Law Judge

Workers Compensation Board